# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 1, 2011 Session

## JOHN MICHAEL BANE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26409        W. Mark Ward, Judge**

---

**No. W2009-01653-CCA-R3-PD  - Filed July 21, 2011**

---

In 1990 a Shelby County jury convicted, the Petitioner, John Michael Bane, of felony murder and imposed a sentence of death.  On appeal, the Tennessee Supreme Court affirmed the conviction but remanded the case for resentencing.  *State v. Bane*, 853 S.W.2d 483 (Tenn. 1993).  After a new sentencing hearing, the jury again imposed a sentence of death, and the Tennessee Supreme Court affirmed the jury's imposition of this sentence.  *State v. Bane*, 57 S.W.3d 411 (Tenn. 2001).  The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing.  The Petitioner now appeals, contending that: (1) he received ineffective assistance of counsel at his original trial and at his resentencing hearing; (2) the trial court erred when it instructed the jury; and (3) the death penalty is unconstitutional.  After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Ann C. Short Bowers, Knoxville, Tennessee, and Marty B. McAfee, Memphis, Tennessee, for the Appellant, John Michael Bane.

Robert E. Cooper, Jr., Attorney General and Reporter; Frank Borger-Gilligan, Assistant Attorney General; William L. Gibbons, District Attorney General; John Campbell, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I.  Facts
#### A.  Procedural History

In 1990, a Shelby County jury convicted the Petitioner of felony murder in the perpetration of a robbery in the death of Royce D. Frazier. The jury originally imposed a sentence of death finding that the following two aggravating circumstances outweighed any mitigating evidence: (1) that the murder was especially heinous, atrocious, or cruel; and (2) that the murder was committed during the perpetration of a felony. *See* T.C.A. § 39-2-203(i)(5), (7) (1982). On direct appeal, the Tennessee Supreme Court affirmed the conviction but set aside the death penalty and remanded the case for a new sentencing hearing in light of *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992). *See State v. Bane*, 853 S.W.2d 483, 483 (Tenn. 1993).

A new sentencing hearing was held where the jury again imposed a sentence of death. The jury found that the following two aggravating circumstances outweighed any mitigating evidence: (1) that the murder was especially heinous, atrocious, or cruel; and (2) that it was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. *See* T.C.A. § 39-2-203(i)(5), (6) (1982). On appeal, the Tennessee Supreme Court affirmed the sentence of death. *See State v. Bane*, 57 S.W.3d 411 (Tenn. 2001).

The Petitioner subsequently filed a petition seeking post-conviction relief. Following an evidentiary hearing, the post-conviction court denied the Petitioner's request for post-conviction relief.

## B. Facts From Guilt Phase

In the opinion in which the Tennessee Supreme Court concluded that the evidence against the Petitioner was sufficient to sustain his conviction, but that the case must be remanded for resentencing, the Court recited the facts against the Petitioner as follows:

> [The Petitioner] was convicted of the first-degree felony murder of Royce D. Frazier on 17 November 1988. Frazier was a widower in his early 60's who lived alone in the Frayser area of Memphis. A prime witness at the trial was Thomas Lovett, the 16-year-old son of Donna Lovett, a co-defendant who was tried separately. [The Petitioner] and Donna Lovett were living together in Ripley, Tennessee. Shortly before the homicide Thomas Lovett, who had been living with his father in Memphis, came to live with his mother and [the Petitioner]. The boy testified that on Wednesday night, November 16, 1988, the [Petitioner] and Ms. Lovett had been experimenting with putting Visine in beer. They told his older brother Br[ian] to drink it, and when it put him to sleep [the Petitioner] said, "All right, it worked." On Thursday, November 17,

1988, Thomas, his brother Br[ian], his mother and the [the Petitioner] drove to Memphis to get the younger boy's school records so he could enroll in school in Ripley. They kept driving by a house in the Frayser area where the [Petitioner] said they were going to borrow some money from a friend. After driving by the house several times they finally saw a car at the house and determined that someone was home. [The Petitioner] dropped Ms. Lovett off at the corner, then took Br[ian] and Thomas to the home of Br[ian]'s girlfriend where he left them. He later came back and picked up the two boys. The three of them returned to Frayser to the house trailer residence. [The Petitioner] and Br[ian] left Thomas there. They took [the Petitioner's] car and returned to Ripley. When Thomas awoke the next morning all three of the others were there. He, [the Petitioner] and Br[ian] went shopping and [the Petitioner] bought various articles of clothing for the three of them. [The Petitioner] told Thomas he had borrowed six or seven hundred dollars. After they finished shopping they went to a laundry and washed clothes. While they were driving about they crossed a bridge, [the Petitioner] asked Thomas to hand him a paper sack from the back passenger area where he was sitting. He handed the sack to [the Petitioner] and he threw it out of the car, "but it missed the bridge." They backed up and retrieved the items which had fallen from the bag, threw it over the bridge rail and then drove off. He thought the bag contained trash but saw that it contained "a telephone and some balled-up paper and stuff like that." That night [the Petitioner], Br[ian] and Thomas went out driving. A little later they dropped [the Petitioner] off at a bar. Br[ian] and Thomas continued to drive around for awhile. Subsequently the two young men returned and picked up [the Petitioner] and a female who he did not know. At [the Petitioner's] request they dropped him and the woman off at a motel and they went home.

Br[ian] Lovett was classified as an accomplice by the trial judge. It was his testimony that on 14 November 1988, he was living with his mother and [the Petitioner] and was present when a discussion took place about obtaining some money. His mother mentioned the name of a man named Royce Frazier. [The Petitioner] said if they robbed the man they would have to kill him because he knew my mother and would be able to turn her in. He testified he had met Mr. Frazier at a café called the "Log Cabin" where his mother had worked and Frazier was a regular customer. His mother remarked that Frazier would be getting back in town soon and would have money when he got back in town. He testified that during the discussion about killing Mr. Frazier he mentioned that they could choke him. On November 16, when [the Petitioner], his mother, his brother and he were returning from Memphis his mother put

about three-fourths of a bottle of Visine in a beer and he chugged it down. He did fall asleep. On the next day, 17 November 1988, the four of them drove to Memphis to get his brother's school records. They went out to Frayser where they drove by . . . Frazier's house to see if his car was there or not in order to determine if he was at home. They stopped at a 7-11 store where they called his father's house and determined he was at home. They drove by Frazier's residence again and saw that he was there. They went to his father's house where they picked up some of Tommy's clothes then returned to Frayser. They dropped Ms. Lovett off on the corner close to the Frazier residence and [the Petitioner] took him and his brother over to his girlfriend's house. He knew that his mother was supposed to be getting [Frazier] to sleep so [the Petitioner] could go back and enter the house to get the money. [The Petitioner] called about 8:30 and said the plans were just getting under way and he was coming over to pick up him and his brother to take them back to Ripley. The three of them returned to Ripley where they left his brother. He and [the Petitioner] returned to Frayser. When they reached Frazier's house the front porch light flickered and they pulled up in the driveway. This was a signal from his mother for [the Petitioner] to come in. [The Petitioner] started walking toward the house then returned to the car. They pulled out of the driveway, drove around the block a couple of times and parked on the street corner near Frazier's house. They waited for about five (5) minutes and then the light flickered on and off again. [The Petitioner] got out of the car and walked into the house. He said it seemed as if he waited at least two (2) hours and he was getting scared because he knew what was going on and knew his mother was in the house. He was scared for her. He got out of the car and walked halfway up the driveway to the house when a dog barked in the back yard. This frightened him and he returned to the car. In approximately 10 minutes his mother and [the Petitioner] came running out of the house toward the car. He got out of the front seat and opened the door on the passenger side to get in the back. It frightened his mother because she didn't know that he was in the car. They were carrying a shotgun, a stereo, a bunch of telephones, a pack of cigarettes, a lighter, a white shirt, and a camera in a black case. They put all of these items in the back passenger compartment and drove off headed back to Ripley. As they were driving along [the Petitioner] commented, "I did such a good job, I deserve a beer." They stopped at a convenience store to get a beer and then continued their journey. They stopped again at a bridge where he was told to throw some telephones, the cigarettes, the lighter and a few other things from the bridge. They drove further when his mother realized she had [Frazier's] wallet. They pulled over to the side of the road, put the wallet in a paper sack, poured brake fluid on it and set it on fire and burned the

wallet. On the way back to Ripley, [the Petitioner] told him that when he went into Frazier's house [Frazier] was in the bathroom and he stood in the living room waiting for him to come out. When [Frazier] came out, "He said that he hit [Frazier] with all he had and all he did was fall down and get right back up. And he had told me, that he had tried, that he had his hands in [Frazier's] pants cutting his nuts and that he put a cord around [Frazier's] neck and that my mother had put a plastic bag over [Frazier's] head, and that they had put him in a bathtub full of water." [The Petitioner] told him he got $726 from [Frazier]. He knew [the Petitioner] had a knife that night because he had given it to [the Petitioner] while he was taking him and his little brother over to his girlfriends. When they arrived at the trailer Tommy was asleep. He tried to go to sleep and dozed off. About 2:30 he was awakened by his mother. She was crying and he referred to her as hysterical. Eventually she returned to bed. When he awakened in the morning his mother, [the Petitioner] and his brother had already had breakfast and were preparing to go to the laundromat. He remained at the trailer and at some time threw away the jacket [the Petitioner] had worn the night before because it had blood on it. When the others returned he, [the Petitioner] and Tommy went to a country and western store in Dyersburg where [the Petitioner] bought boots and clothing for the two boys and for himself. The total bill was $228 which he paid in cash. That night he, [the Petitioner] and Tommy went out driving. He and [the Petitioner] noticed that there was a paper sack in the car containing a phone and also a cord which he said [the Petitioner] had used to strangle [Frazier]. They did not want Tommy to know what they were doing so they put garbage in the top of the paper sack which they intended to throw off a bridge while he drove across it. Bryant threw it out and missed. They turned around, drove back, got out and threw it over the bridge. They told his brother it was trash. They took [the Petitioner] to a place called "The Loafers Lounge" where they waited while [the Petitioner] was inside. When he returned about an hour later he had Joanie with him. Bryant and Tommy then took the Petitioner] and Joanie to a motel. He and Tommy went to Dyersburg where they got something to eat and played some video games. They then went home. His mother asked where [the Petitioner] was and he told her he had dropped him and Joanie off at a motel. His mother appeared hurt and angry at [the Petitioner]. He took her to the motel and showed her where [the Petitioner] and Joanie were. He watched her while she made two calls from a pay phone in front of the motel. She called the Memphis police and also Sheriff Durham. The sheriff came to the motel where he talked with his mother. Sheriff Durham then told him to follow them back to the sheriff's station.

-5-

There was other evidence in the record that personnel in the Memphis Police Department received a telephone call from a woman at approximately 2:30 a.m. on the morning of November 19, 1988. As a result officers initiated an investigation at 3320 Madewell, Frayser, the residence of Royce Frazier, to determine if he was dead. The police found Mr. Frazier's dead body in the bathtub. The tub was almost full of water. There was a clear plastic bag over his head and what appeared to be an electrical cord around his neck. There was a gag in his mouth which was tied behind his head. A bathroom type plunger with a rubber suction on it was over his head.

Sheriff Wilford Durham testified that he arrested Donna Lovett in front of the Walker Motor Court in Ripley where she was talking on the telephone to a representative of the Memphis Police Department. After talking to the Memphis officer he also arrested the [Petitioner] who was found in Room 22 of the Walker Motor Court with a young lady named Joanie Sanderson.

Dr. Richard Harruff testified that he performed the autopsy on the body of Royce Frazier. When he first saw the body on November 19, 1988 he observed injuries to the head and neck. There was an electric cord tied around his neck, a plastic bag over his head and a gag in his mouth. His findings indicated that Mr. Frazier had died of ligature strangulation with other possibilities of asphyxia. Asphyxia is a general term which means a mechanism of dying in which the oxygen is cut off from the body tissues, by cessation of blood flow which cuts off the supply of oxygen and blood to the brain. This could have been caused by the electric cord around his neck, suffocation from the plastic bag over his head, or choking on his tongue which was shoved back in his throat by the tight gag in his mouth. There were bruises on the neck and the skin underlying the cord and other bruising about both eyes. There was bruising and lacerations to the left cheek and left upper lip. There were two areas of bruising on the right scalp area of the head. There were other bruises about the forearms and wrists.

Items of evidence found in [the Petitioner's] automobile included a .12 gauge shotgun, an AM/FM stereo radio, a camera, and a leather vest, all of which were the property of the deceased.

*Bane*, 853 S.W.2d at 484-87. Based upon this evidence, the jury convicted the Petitioner of first degree felony murder, and the Tennessee Supreme Court affirmed the sufficiency of the evidence supporting his conviction. *Id*. at 487, 490. In light of the *Middlebrooks* opinion,

filed shortly before the Supreme Court received the Petitioner's direct appeal, the Supreme Court remanded the case for a new sentencing hearing. *Id*. at 489.

## C. Facts From Resentencing Hearing

Upon remand, the trial court held a resentencing hearing. The Tennessee Supreme Court summarized the facts presented therein as follows:

On November 19, 1988, police found the body of the victim, Royce D. Frazier, age 60, lying in a bathtub full of water in his home near Memphis, Tennessee. Frazier had been gagged; a plastic bag had been placed over his head; and an electric cord was tied around his neck. A plunger had been placed over his face apparently to keep his head submerged. Frazier's house had been ransacked: several lamps and ashtrays had been overturned and numerous items were scattered in disarray.

Brian Lovett, who was 16 at the time of the offense, testified that his mother, Donna Lovett, and the [Petitioner], John Michael Bane, had discussed a plan to rob the victim several days before he was killed. The plan was for Donna Lovett to visit Frazier, who she knew, and render him unconscious by putting Visine eye drops in his beer. [The Petitioner] would then enter Frazier's home and carry out the robbery with Donna Lovett. According to Brian Lovett, [the Petitioner] said that Frazier would have to be killed because he "knew [Lovett] and would tell on her." Brian Lovett said that he and [the Petitioner] discussed choking or stabbing the victim.

On the day after the robbery plan discussion, Donna Lovett and the [Petitioner] experimented by giving Brian Lovett a beer containing eye drops to see whether it would render him unconscious. Brian Lovett testified that it caused him to fall asleep within five minutes of drinking the beer. Thomas Lovett, Brian's younger brother, also testified that he recalled Brian drinking a beer containing eye drops.

Sometime in the late afternoon of November 17, 1988, [the Petitioner], accompanied by Donna Lovett and her two sons, Brian and Thomas Lovett, drove his car past Frazier's home several times, but no one appeared to be home. [The Petitioner] explained that he was going to borrow money from the occupant. When they saw Frazier's car at the home, Donna Lovett got out of the car and went into the house alone. [The Petitioner] then left and drove Brian and Thomas to Brian's girlfriend's home. A short time later, [the

Petitioner] picked up the boys and took them to the Lovetts' trailer in Ripley, Tennessee. Thereafter, [the Petitioner], along with Brian Lovett, returned to Frazier's home. When Donna Lovett signaled by "flickering" the porch light on two occasions, [the Petitioner] entered Frazier's home, leaving Brian Lovett in the car.

According to Brian Lovett's testimony, approximately thirty minutes later [the Petitioner] and Donna Lovett ran to the car carrying several items of Frazier's property. [The Petitioner] had blood on his gloves and Donna Lovett was crying and upset. While driving from the scene, [The Petitioner] told Brian that he had beaten the victim several times because he kept getting up and that he had "cut [the victim's] nuts off." [The Petitioner] also said that he had taken $726 and that he "had done such a good job he deserved a beer." [The Petitioner] was arrested two days later when Donna Lovett reported the events of November 17, 1988 to the police.FN1

> FN1   The evidence indicated that Donna Lovett reported the events to authorities after she learned that the defendant was at a motel with another woman on the day after the offense.

Brian Lovett testified that his sister committed suicide several months before the killing of the victim and that he himself attempted suicide on two occasions before November 17, 1988. He admitted that he had been treated at Charter Lakeside and Memphis Mental Health Institute and that he had a history of using cocaine, speed, marijuana, and alcohol. Lovett also admitted that he had made conflicting statements about the murder. In one statement, he had told authorities that he had looked in Frazier's window and saw [the Petitioner] holding a knife to the victim's groin while Donna Lovett placed a bag over the victim's head. He did not recall why he had made the statement and conceded that he had never left [the Petitioner's] car. Lovett testified that he had been arrested for theft after [the Petitioner] was convicted and that he had been placed in the same prison cell as the defendant. He conceded that he signed a statement that he had lied at trial because he feared the [Petitioner].

Dr. Jerry Francisco, Shelby County Medical Examiner, testified that the cause of the victim's death was ligature strangulation with asphyxia. The combination of the cloth gag, plastic bag, and electrical cord had cut off the supply of blood to the victim's brain and the supply of oxygen to his lungs. The victim's tongue had been pushed into the back of his mouth from the cloth gag. Dr. Francisco stated that the victim could have been rendered

unconscious in seconds or minutes, depending on the severity and force of the ligature strangulation, but that the victim's death required several minutes. Dr. Francisco testified that the victim had extensive bruising around his eyes, head, neck, arms, and hip; a tear and scrape below his left knee; and abrasions around his neck. There was no evidence of injury to the victim's groin area or scrotum. Dr. Francisco testified that fluid found in the victim's lungs are consistent with a finding that the victim had been alive when placed in the water.

The [Petitioner] called several witnesses to testify on his behalf. Brian Lovett identified the handwriting of Donna Lovett in two letters that she had written to [the Petitioner] after the murder. One of the letters indicated that Brian Lovett had lied at trial and was coerced by the prosecution. Donna Lovett also wrote that only she and [the Petitioner] knew what happened in Frazier's home.

Wilma McNeil, the [Petitioner's] aunt, testified that [the Petitioner] had been "very close" to his mother, who died of cancer in April of 1988. McNeil testified that [the Petitioner] had grown up working on a farm. She stated that she loved [the Petitioner] and asked the jury to spare his life. Maybelle Cunningham, also an aunt of the [Petitioner], testified that both of [the Petitioner's] parents were deceased. Cunningham testified that [the Petitioner] had two sons, ages 14 and 10.

Marvin Ramey testified that [the Petitioner] had worked on his farm when he was young and was a good worker. Ramey testified that his wife looked after [the Petitioner] and that he had never caused any trouble.

Teresa Goforth, a co-worker of [the Petitioner] and Donna Lovett at J.P.W. Enterprises, testified that [the Petitioner] was a good, hard worker. She testified that [the Petitioner] and Donna Lovett were dating and that Lovett was extremely jealous. About one week before the murder, Donna Lovett told Goforth that "if she couldn't have [the Petitioner], no one would and that she would see him locked away so far he would never get out."

Alicia Shadell Gray, Bane's cousin, likewise testified that Donna Lovett was very possessive and jealous. Three weeks before the murder, Gray heard Lovett say, "If I can't have [the Petitioner], no woman will have [the Petitioner], and I'll see us both behind bars." Donna Lovett attempted suicide later that day at Gray's home by overdosing on pills, and [the Petitioner] took

her to the emergency room. Gray testified that after [the Petitioner] was convicted, Brian Lovett told her that his mother had agreed to plead guilty in exchange for a sentence of 35 years and that he did not want to see "an innocent man" go to prison. He said he planned to write an affidavit stating that [the Petitioner] had no part in the offense.

Diane Bane testified that she met [the Petitioner] while he was in prison and fell in love with him after talking regularly to him on the telephone. She married [the Petitioner] in March of 1995 and travels 200 miles round trip every Saturday to visit him. Her former husband died in August of 1994, and she had three sons from that marriage.

*Bane*, 57 S.W.3d at 416-18. Based upon the evidence presented at resentencing, the jury found the evidence supported two aggravating circumstances: (1) that the murder was "especially atrocious or cruel in that it involved torture and depravity of mind"; and (2) that the murder was "committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." *See* T.C.A. § 39-2-203(i)(5)-(6) (1982); *Bane*, 57 S.W.3d at 418-19. After further finding that the aggravating circumstances outweighed the evidence of mitigating circumstances, the jury imposed a sentence of death. *Id*. at 419.

### D. Post-Conviction Facts

The Petitioner then filed a petition for post-conviction relief, alleging among other things that he received the ineffective assistance of counsel during his trial and during his resentencing hearing. The post-conviction court held a hearing on the petition, and the record from that proceeding indicates that the Petitioner was represented during his trial and on direct appeal by two attorneys, Brett Stein and Craig Hall. At the resentencing hearing and the appeal of the trial court's denial of his request for resentencing, the Petitioner was represented by Charles Kelly, Sr., and Joseph Ozment. Each of these four attorneys, along with several other witnesses, testified at the Petitioner's post-conviction hearing.

Lieutenant Sheffield and Sheriff Durham, two police officers involved in the investigation of Frazier's death, testified at the post-conviction hearing that they received a call during the night from Donna Lovett about Frazier's death. Sheriff Durham testified that, when Lovett initially called, she told the sheriff that the Petitioner was at Walker Motor Court Motel with another woman. Sheriff Durham said he informed her that the Petitioner was not committing a crime, after which Donna Lovett informed him that she and the Petitioner had robbed and killed a man at his residence in Frayser. Sheriff Durham instructed Donna Lovett to come to the jail, and, when she failed to arrive, Sheriff Durham drove to

-10-

Walker Motor Court where he saw her talking on a pay phone. Donna Lovett spoke into the telephone, saying that Sheriff Durham had arrived and then handed the phone to the sheriff. The sheriff took the phone and learned that an officer from the Memphis Police Department was on the other end of the phone line, and the officer and the sheriff discussed Lovett's allegations. They agreed that Memphis police officers would go to the house where the alleged murder had taken place and that Sheriff Durham would have an officer remain at the motel where the Petitioner was staying.

Sheriff Durham testified that, when Memphis police officers arrived at the house in Frayser described by Lovett, they discovered the body of a man later identified as Royce D. Frazier. The body was in the exact condition described by Lovett. The Memphis police officers then contacted Sheriff Durham and confirmed the homicide. Sheriff Durham took Lovett to jail, and he then returned to the motel and retrieved a pass key to the Petitioner's room from the manager. Because Lovett had informed Sheriff Durham that the Petitioner had a shotgun and had said he "was not going back to the penitentiary," Sheriff Durham knocked cautiously on the door of the Petitioner's motel room. When the Petitioner did not respond, the sheriff used the pass key to enter the room where he found the Petitioner and a woman asleep in bed. Sheriff Durham placed handcuffs on the Petitioner and took him into custody.

During the initial telephone calls, Donna Lovett described to the sheriff and the lieutenant the vehicle that she and the Petitioner had used during the homicide and told them where the vehicle was located. She informed them both that items taken from the victim's home, including a gun, were in the vehicle. Officers from the Sheriff's Department located the vehicle parked in a trailer park as described by Donna Lovett, and the sheriff recalled seeing a "long gun" inside the vehicle. Sheriff Durham testified that the two Memphis investigators obtained the Petitioner's consent to search the vehicle and then had the vehicle transported to a garage in Memphis where they conducted an inventory search of the vehicle. Sheriff Durham stated that, although they did not remove any items from the vehicle, he recalled seeing a "long gun" inside the vehicle.

As part of the investigation, Lieutenant Sheffield took written statements from Thomas and Brian Lovett, Donna Lovett's sons. In his first statement, Brian Lovett maintained that he did not see what had occurred inside Frazier's residence but had learned of it through the Petitioner and Donna Lovett. Brian Lovett subsequently gave a second written statement in which he disclosed that he looked through one of Frazier's windows and observed what had occurred, a fact he did not disclose in his original statement.

Lietenant Sheffield could not recall whether he had spoken to the Petitioner's trial counsel or any other attorney regarding this case, except for the prosecutor.

-11-

Brett Stein, who represented the Petitioner at trial, testified that he had been licensed to practice law in Tennessee since 1963 and that his practice primarily consisted of criminal defense. When Stein was appointed to represent the Petitioner in 1989, he represented two or three other defendants in trials where the State was seeking the death penalty. Stein recalled that, in 1989, the training in death penalty cases was not as significant as it is currently, and he stated that the standards for representing a defendant in a death penalty case have changed since that time.

Stein testified that his file on the Petitioner's case was destroyed in a fire and that he did not independently recall the number of times he met with the Petitioner. He, however, stated that he met with the Petitioner as often as he believed was necessary in order to prepare the case for trial. He further stated that he had a "good" relationship with the Petitioner, whom he described as cooperative and lucid and as assisting Stein in developing issues for trial.

According to Stein, the Petitioner maintained that he was not present when Frazier was killed and was not involved in his death. Stein noted that the Petitioner never gave a statement of admission to the police. Accordingly, Stein prepared and presented the defense theory that the State could not prove its case beyond a reasonable doubt. He did not attempt to establish that someone else killed the victim.

Stein conceded he did not seek funds to hire an investigator, a mitigation expert, or a pathologist. He instead interviewed all the witnesses, including persons the State listed as witnesses whom the State intended to call at trial. Stein also subpoenaed several of these witnesses.

Stein recalled that he filed a motion to suppress the evidence about the items from Frazier's home that officers found in the trunk of a vehicle that police located at a trailer park where the Petitioner was staying with Donna Lovett. The items found in the car were confirmed to have been taken from Frazier's house. He recalled that the trial court held an evidentiary hearing on the motion but that the motion was ultimately denied. Stein agreed he did not raise in the motion to suppress the issue of the legality of the initial seizure of the vehicle and did not inquire into whether the vehicle was in operating condition or had been recently serviced. Further, he stated that the State never proved at trial that the vehicle belonged to the Petitioner. The State did, however, assert at trial that the car belonged to the Petitioner and that the evidence found inside the car tied the Petitioner to the crime scene.

Stein testified that Brian Lovett's credibility was a key issue at trial, in part because Brian Lovett admitted to participating in the planning of the homicide. While Stein assumed that the State had made a "deal" with Brian Lovett, the prosecutor never told him that the

State had granted Brian Lovett immunity in exchange for his testimony at trial. Stein categorized such evidence as exculpatory and stated that the prosecutor would have provided the information if such a deal existed. Stein assumed that the State also gave Donna Lovett a "deal"; however, the prosecutor never stated that the State had entered into an agreement with her.

Stein testified that, when he cross-examined Brian Lovett, he focused upon Brian Lovett's inconsistent statements to the police and his admitted participation in the homicide. Stein said he received as part of discovery Brian Lovett's mental history, which included records indicating that he had been hospitalized a few weeks before this incident because he was suicidal. Stein did not recall whether Brian Lovett had a history of using cocaine, marijuana, or alcohol and he agreed that a history of drug use would have been relevant to Lovett's credibility. Stein agreed he did not hire a psychologist to review Brian Lovett's mental health records and did not recall speaking to Laura Quinn, Brian Lovett's girlfriend at the time of the murder. Stein did not recall receiving information regarding an incident in which Brian Lovett was involved in an altercation with the victim before the homicide. Stein said that the trial court instructed the jury that Brian was an accomplice, and so Stein argued to the jury that, because Brian Lovett was an accomplice, the jury could not convict the Petitioner based upon Lovett's testimony alone. He further argued that the State had offered insufficient evidence to corroborate Brian Lovett's testimony.

Stein testified that he did not request fingerprint analysis or DNA testing on cigarette butts, beer cans, and other physical evidence collected at the scene of the homicide. Rather, Stein argued that the State could not connect any of the physical evidence collected from the scene to the Petitioner. Stein said he also did not meet with the coroner before trial, as he did not believe that the cause of Frazier's death was at issue. He did, however, review the medical examiner's report and visited the scene of the homicide.

Stein testified that the Petitioner had prior convictions, which the State could have questioned him about had he testified at trial. Stein further testified that in questioning mitigation witnesses during the penalty phase, he had to exercise caution to avoid opening the door to the admission of the Petitioner's prior record, which included convictions for crimes of violence.

Craig Hall testified that he was co-counsel during the Petitioner's trial, with his primary duty being to assist Stein during the trial. At the time of his appointment, Mr. Hall had practiced law for sixteen years, and approximately eighty percent of his practice consisted of criminal defense. Hall had tried multiple second degree murder cases, but the Petitioner's case was his first capital defense case. Hall said he participated in interviewing witnesses and that he also made the closing argument in the penalty phase of trial. Hall

discussed with Stein the trial strategy, whom to call as witnesses, and how to approach the State's witnesses. Hall further stated that, in part because the Petitioner maintained his innocence throughout Hall's representation, the theory of the defense was that the Petitioner was not involved in the homicide.

Charles Kelly, Sr., testified he was retained to represent the Petitioner at the resentencing hearing. At the time of the post-conviction hearing, Kelly had been practicing law for thirty-seven years and had represented clients in twenty-five to thirty murder cases. The post-conviction court allowed Kelly to testify as an expert in the community standards for capital defense representation. In that regard, Kelly testified that in the late 1980s, more procedural safeguards and death penalty training for attorneys came into existence. At the time of the guilt phase of the Petitioner's trial, the American Bar Association guidelines mandated that an investigator be hired and that the State provide funds and a mechanism to obtain an investigator. Kelly stated that, in his view, an attorney's failure to retain an investigator in a capital case violated the standards of competent representation.

Kelly opined that Brian Lovett's testimony was of great significance to the Petitioner's conviction and that the Petitioner's trial counsel could have done a better job cross-examining him. Kelly thought that the Petitioner's trial counsel could have pursued valid impeachment avenues regarding Brian Lovett's mental health history, history of drug use, prior acts of violence, and any agreement Lovett had made with the State. Kelly did not, however, recall seeing a written immunity agreement between Brian Lovett and the State. Kelly also took issue with the fact that the Petitioner's trial counsel did not file a motion to suppress specifically challenging the initial seizure of the Petitioner's vehicle. Kelly did not believe that anyone inspected the car at the time of the Petitioner's trial to determine whether it was operational.

About his own representation of the Petitioner, Kelly testified that in order to prepare for the resentencing hearing he reviewed the transcript from the guilt phase of the trial. Kelly filed motions for appointment of co-counsel and for funds to hire an investigator, eventually hiring Ronald Lax as the investigator. At the time of the Petitioner's resentencing in 1997, Donna Lovett was on work release, and, while the prosecutor had written a letter on her behalf to the parole board, Donna Lovett was not cooperating with the prosecution. In fact, she had written letters to the Petitioner, which Kelly used during the resentencing hearing to impeach Brian Lovett's testimony and to establish that he had lied in court. Kelly also attacked the inconsistencies in Brian's statements, his mental health problems, and his drug problems.

During the resentencing hearing, Kelly also attempted to call into question the medical examiner's testimony about the victim's cause of death. He said that, at trial, the medical

examiner did not provide an accurate depiction of the victim's cause of death because the autopsy showed no water in the victim's lungs. This, he argued, contradicted the State's theory that the Petitioner and Donna Lovett used a toilet plunger to hold the victim underwater repeatedly or for a period of time sufficient to drown the victim. Kelly stated that retaining a pathologist to testify that the victim did not drown could have made a difference in the guilt phase and that such evidence could also have been used to attack the heinous, atrocious, or cruel aggravating factor and would be of the most importance during the penalty phase.

To prepare to call the medical examiner's testimony into question during the resentencing hearing, Kelly consulted with Dr. Kris Sperry, a pathologist in Atlanta, Georgia. Kelly recalled that, during the resentencing hearing, the medial examiner testified that there was no water in the victim's lungs but that the victim had a small amount of phlegm or liquid in his bronchial tubes, which could have established drowning. Kelly explained that he was unable to present Dr. Sperry's testimony because the doctor had to return to Atlanta, and Kelly did not believe that Dr. Sperry's testimony would be effective given the medical examiner's adamant testimony that the victim drowned. Kelly further recalled that, during the medical examiner's testimony, one of the jurors, who was a physician, "nodd[ed] his head."

Kelly discussed with the Petitioner which witnesses to call for mitigation evidence. Kelly wanted to present proof about the Petitioner's mother's alcohol use because studies have suggested that alcoholism is hereditary. Therefore, when a person with that trait becomes intoxicated, the issue is whether the intoxication is voluntary or involuntary. The Petitioner refused to allow him to present such evidence.

Kelly did, however, present the testimony of the following people to attempt to persuade the jury not to sentence the Petitioner to death: Wilma McNeil, the Petitioner's aunt; Marvin Ramey, the Petitioner's former employer; and Teresa Goforth, a former co-worker. Kelly stated that these witnesses were discovered through a combination of interviews with the Petitioner and his wife, a review of the trial counsel's file, and an investigation by Ronald Lax.

Kelly testified that, during both the penalty phase of the first trial and at re-sentencing, the trial court gave an improper jury instruction regarding the burden of proof for aggravating and mitigating factors and the weighing of such factors. Kelly stated that there was no objection to these instructions, and the issue was not raised in the motion for new trial or on appeal. Kelly added that, before the resentencing hearing, he unsuccessfully attempted to settle the case for a life sentence.

Joseph Ozment testified he was appointed as second chair to represent the Petitioner at resentencing. Ozment, who had practiced primarily criminal defense law since 1992, said he was certified to represent defendants in capital cases and had been involved in capital case defense since 1994 or 1995. Ozment opined that the failure to hire an investigator in any capital murder case was unacceptable under the applicable standards because an investigator has expertise in locating people and taking statements. Further, an investigator can assist in creating a social history for the entire family of the accused, which is needed for mitigation purposes.

Ozment testified ethical considerations also exist if a witness changed his or her story because, in this event, the attorney who interviewed that witness may become a witness for trial purposes. Ozment testified that the State is required to list its witnesses on the back of the indictment. When and if counsel filed a motion for a witness list, the State generally responds that its witnesses are listed on the back of the indictment and that they have an open-file policy allowing defense counsel to discover those witnesses.

Ozment recalled that he and Kelly utilized the services of Dr. Sperry, a pathologist from Atlanta, Georgia. The trial court denied their request to allow Dr. Sperry to be present during the testimony of the State's medical examiner. Thus, he said the defense was forced to address the issue of whether the victim was drowned during the cross-examination of the medical examiner.

Ozment stated that Brian Lovett's testimony was critical to the State's case in both the guilt and penalty phases. While Brian was never charged with a crime, even though he was involved in the victim's death, Ozment was not aware of any promises of immunity made by the State to Brian. Ozment, however, attempted to utilize the perception that the State was treating Brian favorably during the resentencing hearing. Ozment and Kelly also used Brian's mental health history and history of drug and alcohol abuse to impeach his testimony.

Ozment recalled that Brian testified at both the original trial and at the resentencing hearing that he had told Laura Quinn, his then girlfriend, about the plan to rob and kill the victim. Quinn, however, denied that Brian ever told her of the plan. Ozment stated that, although he did not call Quinn as a witness at the resentencing hearing because he felt Brian had been sufficiently impeached, she would have been a good witness to call at the guilt phase. Ozment stated he did not call Quinn in part because he believed that the introduction of too much residual doubt evidence after the Petitioner had already been found guilty could inflame the jury.

Laura Quinn Dolan testified that she dated Brian Lovett in 1988 when she was seventeen years old. Dolan was unsure whether she saw Brian on November 17, 1988, the

day the victim was killed. She recalled an occasion when Brian and Thomas came to her house and Brian told her that he was going with Ms. Lovett and the Petitioner to Frayser. Dolan maintained that Brian never told her that either he, Ms. Lovett, or the Petitioner planned to rob or kill the victim.

Dolan testified that she learned of the homicide when Brian called her and stated that his mother's boyfriend had murdered someone. Dolan did not recall what day the murder occurred or what day Brian and Thomas went to her house. She was also unsure of the dates in 1997 when she spoke to an investigator. Dolan recalled that Brian had told her that he was afraid that the Petitioner would send someone to hurt him.

Ronald Lax testified he was a private investigator for Inquisitor, Inc., who was retained with regard to the Petitioner's resentencing hearing. Lax's job was to develop evidence of the Petitioner's innocence to be used as mitigating evidence during his resentencing hearing. Dr. Einstein in Nashville was in charge of investigating the remaining mitigating evidence.

Lax testified he reviewed documentation provided by counsel consisting of trial transcripts and statements of witnesses. Lax cross-referenced Brian Lovett's statements to the police with his testimony at trial and found five to ten inconsistencies in his testimony. Lax recalled that Brian testified that he told Dolan of the plan to rob and kill the victim but that Dolan denied Brian told her of the plan. He recalled Dolan did not testify during the guilt phase or at the resentencing hearing.

Lax said he also interviewed Kay Lowry, the owner of the Log Cabin Restaurant from 1976 to February 1988. Lowry stated that she caught Brian Lovett stealing from her on one occasion. During his interview with Lowry, Lax developed information regarding an incident at the Log Cabin Restaurant during which a younger man, who accompanied Donna Lovett, got into an altercation with the victim and struck the victim. The incident occurred weeks or months prior to the victim's murder.

Lax testified he also interviewed Gary Whitney, who stated that the victim would frequent the Log Cabin Restaurant, drink quite a bit of alcohol, and "flash" money. Whitney recalled an altercation between the victim and a young man. Whitney did not know the identity of the young man and stated that the altercation occurred anywhere from three months to one year prior to the victim's death.

Thomas Henderson, the Assistant District Attorney General who prosecuted the Petitioner, testified that, before the trial, District Attorney General Hugh Stanton offered Ms. Lovett forty years of incarceration and the Petitioner sixty years of incarceration. Ms.

Lovett's offer was later reduced to an offer of thirty-five years, which she accepted. The offer made to Ms. Lovett was not contingent on her testifying against the Petitioner.

General Henderson testified that he spoke to Ms. Lovett after she entered her plea and that she expressed loyalty toward the Petitioner. As a result, General Henderson decided not to call her as a witness in the Petitioner's initial trial. General Henderson visited Ms. Lovett at the penitentiary sometime between the Petitioner's initial trial and the resentencing hearing. Ms. Lovett appeared cooperative and stated that she was willing to testify against the Petitioner. General Henderson, however, decided not to call her as a witness as she had previously written letters to the Petitioner expressing her loyalty to him.

General Henderson testified that the State had not made an agreement with Ms. Lovett in exchange for her guilty plea. The general did not recall writing a letter to the parole board on Ms. Lovett's behalf. He stated that, if he did write such a letter, it was neither contingent upon Ms. Lovett's agreeing to testify nor was it at Brian Lovett's request. General Henderson denied, however, that Brian Lovett's testimony was conditioned upon the letter.

General Henderson recalled that, at the time that the Petitioner was indicted, the grand jury section of the District Attorney General's office prepared the indictments without the input of the prosecuting attorney. The grand jury had not indicted Brian Lovett when General Henderson was assigned the Petitioner's case. General Henderson testified that, after he reviewed the case, he also did not seek an indictment against Brian Lovett. General Henderson maintained that this decision was based not upon Ms. Lovett's guilty plea but upon his belief that Brian Lovett made a better witness than a defendant. Further, General Henderson said that because of Brian Lovett was a juvenile when the murder occurred, he would have been a sympathetic defendant. Further, Brian Lovett's older sister committed suicide, and he suffered from emotional issues as a result of her suicide. General Henderson further explained:

> And this particular incident his father, I think, had just kicked him out of the house. He went to live with his mother who had thrown away her career and her life for some prisoner she'd help escape, that being the [Petitioner], from the penitentiary and then her and her new criminal boyfriend were talking about killing and robbing people and I felt like he really never had much of a chance.

General Henderson testified that he called Brian Lovett as a witness during the guilt phase and that Brian Lovett admitted during direct examination that he had lied to the police. General Henderson explained:

-18-

[When a witness has previously lied] can be an important issue, unless it is explainable, or there are other factors to consider. The problem that [] Stein, I think, was facing in the strategy point of view is cross-examining a seventeen year old who had been victimized by his mother and the defendant. He made a very sympathetic figure and you've got to be careful about jumping on somebody like that in front of the jury when your client's facing death.

General Henderson noted that Stein questioned Brian Lovett for almost one hundred pages of the transcript and that much of Stein's cross-examination addressed the inconsistent statements.

General Henderson testified that, during the years between the Petitioner's initial trial and his resentencing hearing, Brian Lovett was arrested and housed in the same area as the Petitioner. Brian Lovett contacted General Henderson and expressed his fear of the Petitioner and stated that the Petitioner had convinced him to sign an affidavit claiming that his testimony at the Petitioner's trial had been fabricated. Brian Lovett later provided General Henderson with a statement in which he maintained that he was coerced into signing the affidavit and affirmed that his original testimony at trial was true. General Henderson recalled that the affidavit was addressed at the resentencing hearing.

After the hearing, the post-conviction court entered a ninety-nine-page order dismissing the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner contends that the trial court erred when it dismissed his petition for post-conviction relief. He asserts that he is entitled to post-conviction relief because he received the ineffective assistance of counsel during his original trial and at his resentencing hearing, as will be detailed below. He also asserts that he should be granted post-conviction relief because the trial court erred when it instructed the jury at the original trial and at the resentencing hearing. Finally, the Petitioner contends he should be granted post-conviction relief because the death penalty is unconstitutional.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless

we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

### A. Originally Alleged Grounds For Post-Conviction Relief

In the first section of the Petitioner's brief, before the "argument" section, the Petitioner states, "Petitioner Bane is pursuing multiple claims in support of post-conviction relief. His claims and the corresponding rulings by the post-conviction court are as follows: . . . ." The Petitioner's brief then lists, in bullet point form, one sentence describing each of the allegations he made in his post-conviction petition. Each bullet point is followed by the post-conviction court's corresponding findings denying post-conviction relief based upon that allegation. The only citation to the record contained in this section of the Petitioner's brief is to the post-conviction court's written ruling. In this section, the Petitioner offers no other citations to the record, no citation to any legal authority, and no argument to support that he is entitled to relief based upon these allegations. In the following section, the "argument" section, the Petitioner expounds only upon his counsels' failure to file a motion to suppress, issues related to the court's instructions to the jury, and to the constitutionality of his sentence. We could properly deem the issues not properly briefed waived by the Petitioner. *See* Tenn. Ct. Crim. App. R. 10(b) ("[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

At risk in this case, however, is this Petitioner's life. The gravity of that is not lost upon this Court. While we find the Petitioner's brief in this case wholly inadequate on the majority of these issues, we will nonetheless review the merits of each of the allegations raised in bullet point form after the facts section of the Petitioner's brief:

- Trial counsel conducted inadequate pretrial investigation.

- Trial counsel failed to secure the services of an investigator.

- Trial counsel failed to challenge the warrantless seizure and search of Petitioner Bane's vehicle that supplied the only evidence that corroborated the state's key witness.

- Trial counsel failed to inspect and analyze the state's physical evidence, which impaired the development of valuable information.

- Trial counsel failed to investigate and uncover alibi evidence.

- Trial counsel failed to request and receive the state's witness list prior to trial, which would have facilitated defense investigation.

- Trial counsel failed to present direct evidence of the cause of death through a pathologist available to prove drowning was not the cause of death.

- Trial counsel at resentencing failed to object and request a mistrial when the state elicited testimony that Petitioner Bane had previously been sentenced to death.

- Trial counsel failed to request the mandatory jury instruction on the state's burden of proof beyond a reasonable doubt, pursuant to T.P.I. 2.02, failed to object to the omission fo the instruction, and failed to raise the omitted instruction in the motion for new trial or on appeal.

- Trial counsel failed to object to the jury instructions relative to the appropriate verdict forms, requiring unanimity to give effect to any mitigation offered, shifting the burden, and lessening the state's burden to proving the aggravating factors and failed to raise the issue on appeal.

- Trial counsel at resentencing trial failed to object to the jury instructions relative to the appropriate verdict forms and lessening the state's burden and failed to raise the inappropriate jury instruction in a motion for new trial and on appeal.

- Trial counsel failed to apprise the jury of the appropriate weighing approach in considering the state's burden for the elements of the offense and the correct burden for aggravating factors and mitigating circumstances.

- Trial counsel failed to ensure that all specific mitigating circumstances were included in the jury instructions.

- The trial court failed to properly instruct the jury relative to the correct burden of proof for the conviction of the charged offense.

- The trial court, in the original 1990 trial, failed to properly instruct the jury regarding appropriate verdict forms for a death verdict.

- The trial court, in the resentencing trial in 1997, failed to properly instruct the jury regarding the appropriate verdict forms for a life sentence.

- The trial court failed to apply the appropriate heightened standard of due process.

- Petitioner Bane's sentencing was unconstitutionally based upon aggravating factors that were not presented to a grand jury and included in the indictment.

## 1. Ineffective Assistance Of Counsel

In order to properly address each of the issues raised in the Petitioner's brief, we have summarized and restated many of his arguments regarding the ineffectiveness of his counsel. The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697; *Goad*, 938 S.W.2d at 370.

Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

### a. Assistance of Trial Counsel

The Petitioner asserts that his trial counsel were ineffective for failing to: (i) conduct adequate pretrial investigation; (ii) secure the services of an investigator; (iii) challenge the warrantless seizure and search of the Petitioner's vehicle that yielded the only evidence that corroborated the State's key witness's testimony; (iv) inspect and analyze the State's physical evidence; (v) investigate and uncover alibi evidence; (vi) request and receive the State's witness list prior to trial; (vii) present direct evidence of the cause of death through a pathologist available to prove drowning was not the cause of death; and (viii) request certain jury instructions.

### i. Pretrial Investigation

As previously stated, the Petitioner mentions that his trial counsel conducted an inadequate investigation. The only explanation he offers of this claim is to quote the post-conviction court's ruling on this issue:

> Even if counsel should have located witness Laura Quinn [Dolan], there is not a reasonable probability that her testimony would have changed the outcome of the trial. Kay Lowry's testimony that she caught Brian Lovett stealing has marginal value. Gary Whitney's testimony that a young man accompanying Donna Lovett was involved in a physical altercation with Mr. Frazier [the victim] has little value and is speculative. Petitioner Bane's 1990 trial counsel may have been remiss in failing to present some of the mitigation offered at resentencing in 1997; however, because a jury again imposed the death penalty, Petitioner Bane was not prejudiced at his initial sentencing hearing.

Based upon the Petitioner's quotation from the post-conviction court's findings, we infer that he is arguing on appeal that his trial counsel was ineffective for failing to present as witnesses: Laura Quinn Dolan; Kay Lowry; and Gary Whitney.

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*.

-24-

Once a petitioner presents a witness at a post-conviction hearing whom he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). The post-conviction court is justified in finding that trial counsel was not deficient in failing to call a witness at trial if the post-conviction court determines that the witness's testimony would have been inadmissible at trial or that, even if admissible, would not have materially aided the petitioner's defense at trial. *Id.* If the proffered testimony is both admissible and material, the post-conviction court must assess the credibility of the witness. *Id.* at 869-70.

**Laura Quinn Dolan**

The record shows that the Petitioner presented Laura Quinn Dolan as a witness at the post-conviction hearing. Dolan, who had not been called as a witness at the Petitioner's trial or resentencing hearing, testified she was dating Brian Lovett in 1988 at the time of the victim's murder. She recalled an occasion around this time when Brian and Thomas Lovett came to her house and Brian told her that he was going with Ms. Lovett and the Petitioner to Frayser. Dolan maintained that Brian never told her that he, Ms. Lovett, or the Petitioner planned to rob or kill the victim. Dolan learned of the homicide when Brian called her and stated that his mother's boyfriend had murdered someone. Dolan did not recall what day the murder occurred or what day Brian and Thomas went to her house. She was also unsure of the dates in 1997 when she spoke to an investigator.

To confirm Dolan's testimony, the Petitioner also presented testimony from Investigator Ronald Lax who was retained to assist in investigating the Petitioner's case before his 1997 resentencing hearing. Investigator Lax testified that he interviewed Dolan as part of his 1997 investigation. He recounted that Dolan's post-conviction testimony denying that Brian told her of the plan to rob and kill the victim contradicted Brian's testimony that he told Dolan of the plan. Investigator Lax's report, which he prepared after the 1997 interview with Dolan, stated that Dolan "could not remember a lot of details regarding relevant information pertaining to the incident." The report further stated that "although this occurred in November, [Dolan] seemed to recall it taking place in the summer." Additionally, the report provided that, although Dolan indicated that she could recall both Brian and Thomas Lovett coming to her house on the day of the murder, she was unsure of the time they arrived, initially saying it was 7:00 p.m. and 10:00 p.m. and later saying it was closer to 5:00 p.m. The report said Dolan was unable to recall who brought Brian and Thomas Lovett to her house.

According to Investigator Lax's report, Dolan stated that Brian Lovett did not tell her the plan to kill the victim before the murder but she said that, the day after the murder, Brian

told her that the Petitioner had killed the victim. Dolan stated to Investigator Lax that Brian Lovett had told her in the past that Ms. Lovett was involved in a relationship with the victim and that the victim owed Ms. Lovett money. The report indicated, "It seemed like the impression [Dolan] got from Brian was that his mother was trying to collect the money and that [the Petitioner] may have been present because [the victim] had been abusive to [Ms. Lovett] in the past." Dolan provided the investigators with additional details that corroborated much of Brian's testimony, such as that Brian told her he was in the vehicle parked at the victim's house and that he was afraid for his mother so he walked up the driveway, heard a dog barking, and returned to the vehicle because he was scared. Dolan informed investigators that Brian stated that he was afraid of the Petitioner and believed that the Petitioner had people watching him.

In denying relief, the post-conviction court found the Petitioner's trial counsel were not ineffective for failing to locate, interview, or call as a witness Dolan. The court noted that Dolan had "considerable difficulty" recalling the details of the events in question during both Dolan's statement to investigators and in her testimony at the post-conviction hearing. The post-conviction court further noted that the details about which Dolan was certain seemed to corroborate much of Brian Lovett's testimony at trial. Therefore, the court concluded, "[T]here simply is not a reasonable probability that the presentation of this testimony would have changed the outcome of [the] [P]etitioner's trial."

The evidence presented by Dolan would have clearly been admissible, which is the first prong of the post-conviction court's inquiry. *See Pylant*, 263 S.W.3d at 869. The question then is whether the evidence would have been material to the Petitioner's defense. *See id*. As the post-conviction court noted, the details offered by Dolan, about which she was certain, largely corroborated Brian Lovett's trial testimony. She testified that, after the murder, Brian Lovett told her that the Petitioner had murdered the victim. The details she recalled Brian telling her, such as that he exited the car to check on his mother's welfare during the crime but returned to the car when a dog barked, largely comported with Brian's testimony. Dolan was uncertain about much of the rest of her testimony, including the date of the events, who brought Brian and Thomas Lovett to her house, and what time they arrived. We do not perceive how Dolan's testimony would have aided the Petitioner's defense. On the contrary, it would confirm much of Brian Lovett's testimony. Even were we to conclude that Dolan's testimony was material, the trial court made a determination that the uncertainty of Dolan's testimony called her credibility into question. This credibility determination rests soundly with the post-conviction court, and we will not disturb it on appeal. The Petitioner is not entitled to relief with regard to this issue.

## Kay Lowry

The Petitioner similarly makes no argument in his brief about why his trial counsels should have called Kay Lowry and instead quotes only from the post-conviction court's ruling. The Petitioner's post-conviction counsels did not call Lowry to testify at the post-conviction hearing, but Investigator Lax testified that he interviewed Lowry, who was the owner of the Log Cabin Restaurant from 1976 to February 1988. Lowry stated to him that she had caught Brian Lovett stealing from her on one occasion.

As previously stated, to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a petitioner should present that witness at the post-conviction hearing. *See Black*, 794 S.W.2d at 757. "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. While the Petitioner in the case under submission did not present Lowry's testimony, he did offer the testimony of Investigator Lax, who relayed the substance of Lowry's potential testimony. We therefore turn to decide whether the evidence was admissible at trial and material to the defense. *See Pylant*, 263 S.W.3d at 869.

The post-conviction court found that Lowry's testimony had marginal if any probative value, meaning it would not have been admissible at trial or material to the defense. We agree. Lowry's potential testimony that she caught Brian Lovett stealing from her would have been inadmissible as a specific instance of misconduct. *See* Tenn. R. Evid. 608(b) ("Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence."). And, because of the lack of probative value of such testimony, trial counsel would have been prohibited under Rule 608 of the Tennessee Rules of Evidence from cross-examining Brian Lovett regarding the incident. *See id*. Moreover, at trial, Brian Lovett had already admitted to dishonesty in that he lied to the police about the homicide and admitted to his participation in the offense. This admission makes Lowry's purported testimony less significant to the defense. The Petitioner is not entitled to relief on this issue.

## Gary Whitney

Again drawing from the Petitioner's quotation of the post-conviction court's ruling, we turn to address whether the post-conviction court erred when it ruled that the Petitioner's trial counsel were not ineffective by failing to call Gary Whitney as a witness. Whitney did not testify at the post-conviction hearing. Investigator Lax, however, testified he interviewed Whitney, an employee of the Log Cabin Restaurant, who stated that the victim frequented

the restaurant and, while doing so, drank quite a bit of alcohol and "flash[ed]" money. The investigator said Whitney recalled an altercation that occurred between three months and one year before the victim's death between the victim and a young man, whom Whitney could not identify. The "young man" was in the company of Ms. Lovett at the time of the altercation.

The post-conviction court found that such testimony had little, if any, value, was speculative, and would have been inadmissible at trial. *See* Tenn. R. Evid. 402, 403. We conclude the post-conviction court did not err in this regard. First, Whitney was not presented as a witness at the post-conviction hearing and it is not clear what exactly his testimony would have been. Further, we agree with the post-conviction court that this testimony, as presented through Investigator Lax, would not have been admissible at trial. The Petitioner is not entitled to relief on this issue.

### ii. Failure to Hire an Investigator

On this issue, the Petitioner's brief reads:

•     Trial counsel failed to secure the services of an investigator

> Post-Conviction Court: Even if counsel should have hired an investigator for the 1990 trial, Petitioner Bane was not prejudiced by counsel's inaction. [Counsel's] decision not to question Brian Lovett about his prior suicide attempts was a strategic choice. The state provided open-file discovery and if there was any favorable treatment for Donna and Brian Lovett, [trial counsel] would have been provided that information by the state.

From what we can ascertain from the record, the Petitioner alleged during the course of the post-conviction proceedings that if his trial counsels had retained an investigator they would have discovered the agreements that the State had entered into with Ms. Lovett and Brian Lovett, evidence that could have been used to impeach those two State's witnesses on the basis of bias.

The Petitioner's trial counsel testified at the post-conviction hearing that, rather than hire an investigator, he himself conducted the investigation and interviewed witnesses. He subpoenaed witnesses whose testimony at trial would establish that the Petitioner did not need money and that Ms. Lovett was jealous and vengeful. Trial counsel testified that he relied upon the State's open-file discovery policy and that, if the State had entered into an

-28-

agreement with one of the witnesses, it would have provided him with the details of the agreement. Further, he filed various motions requesting disclosure of impeaching information and evidence of any consideration or promises of consideration given to or made on behalf of the State's witnesses.

The Petitioner's trial counsel agreed that he had a copy of Brian Lovett's mental health records, which indicated that Lovett had been hospitalized for attempted suicide. Trial counsel could not recall why he did not cross-examine Lovett about these mental health records. General Henderson, however, testified and explained that shortly before this murder, Brian Lovett's sister had committed suicide, which caused Lovett to suffer mentally. Lovett's father then kicked Lovett out of his home, and Lovett went to live with his mother, who had abandoned her career to live with the Petitioner after helping him escape from prison. Lovett participated in discussions between his mother and the Petitioner during which the two discussed killing and robbing someone. The general stated:

> The problem that [trial counsel], I think, was facing in the strategy point of view is cross-examining a seventeen year old who had been victimized by his mother and the [Petitioner]. He made a very sympathetic figure and you've got to be careful about jumping on somebody like that in front of the jury when your client's facing death.

General Henderson noted that the record of Stein's cross-examination of Brian Lovett was almost one hundred pages of the transcript and that much of Stein's cross-examination addressed the inconsistent statements.

Also, General Henderson testified that he did not enter into any agreement with Ms. Lovett or Brian Lovett. The general explained that he did not prosecute Brian Lovett because he did not believe that he could obtain a conviction, due in part to Brian Lovett's age. The general said he also believed that Brian Lovett was a better witness for the State than a defendant. Further, he said that Ms. Lovett's plea was not contingent upon her testimony or testimony from Brian Lovett.

Counsel has a duty to investigate and prepare a case, and this duty derives from counsel's basic function "to make the adversarial testing process work in the particular case." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). There is, however, no rule requiring defense counsel to retain experts or investigators in every capital case. *See e.g., Andre Bland v. State*, No. W2007-00020-CCA-R3-PD, 2009 WL 910197, at *41 (Tenn. Crim. App., at Jackson, Apr. 3, 2009) (holding that trial counsel was not ineffective in failing to retain a mitigation expert), *perm. app. denied* (Tenn. Aug. 17, 2009); *see also Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *28 (Tenn. Crim. App., at

Jackson, June 25, 2008) (holding that trial counsel was not ineffective in failing to retain an investigator), *perm. app. denied* (Tenn. Dec. 22, 2008). We recognize that, especially in cases where the defendant faces the penalty of death, it is a much better practice for counsel to hire an investigator to assist in investigating the case.

We conclude that in this case, while it may have been better practice for the Petitioner's counsel to hire an investigator, the failure to do so did not result in any prejudice to the Petitioner. First, and perhaps most importantly, the Petitioner has not proven by clear and convincing evidence that there was in fact any agreement between the State and Ms. Lovett or Brian Lovett. Therefore, he has not proven that, had his trial counsel hired an investigator, the investigator would have found any evidence of such an agreement. Second, he has offered no other evidence that an investigator could have uncovered before trial that would have benefitted him during his trial.

With regard to trial counsel's failure to cross-examine Brian Lovett about his mental health history, which we will discuss here based upon the Petitioner's quotation from the post-conviction court's findings, we conclude that trial counsel was not ineffective in this regard. It is true that trial counsel did not specifically recall his reasoning for this failure, but a viable explanation for counsel's decision is apparent from the record. Brian Lovett's mental health records from Memphis Mental Health Institute were entered as an exhibit at the post-conviction hearing. The records revealed two suicide attempts, one in June 1986 and one in October 1988. Both attempts occurred as a result of his thoughts of his sister's suicide. Brian admitted to health officials that he had tried marijuana, LSD, and cocaine in the past but denied recent usage. The records describe Brian's memory for recent and remote as "good" and his retention and recall as "fair." During the trial, the State attempted to question Brian Lovett on direct examination regarding the information in the medical records, and the Petitioner's counsel objected because he believed that such information would provoke sympathy for Brian and thereby prejudice his client. Both General Henderson and trial counsel informed the trial court that the doctors indicated that the suicidal tendencies were not delusional, in the sense that they did not include fabricated fantasies, which would impinge his credibility.

At the post-conviction hearing, General Henderson explained that Brian Lovett was a sympathetic witness. His mental health problems were derived from his sister's suicide, his father's neglect, and his mother's new relationship with the Petitioner, whom she helped escape from prison. Were the Petitioner's trial counsel to cross-examine Brian Lovett about his mental history, much of that evidence, a great deal of which the jury did not hear, would have been admissible. Trial counsel focused his cross-examination of Lovett on Lovett's inconsistent statements and his admission of dishonesty. We agree with the post-conviction court that trial counsel's decision to refrain from cross-examining Brian Lovett about his

mental health history was a strategic decision. The Petitioner is, therefore, not entitled to post-conviction relief on this issue.

### iii. Challenge to Warrantless Search

About this issue, the Petitioner's brief reads:

- Trial counsel failed to challenge the warrantless seizure and search of Petitioner Bane's vehicle that supplied the only evidence that corroborated the state's key witness.

  Post-Conviction Court: Trial Counsel were ineffective in failing to adequately raise and challenge the warrantless seizure and search; however, given the controlling case law at the time, a challenge would not have been successful and the outcome of the trial would not have been different.

The Petitioner briefs this issue extensively later in the argument section of his brief. We will, therefore, refrain from addressing it here, in the bullet point listing of his post-conviction issues. We will, however, discuss it in depth below.

### iv. Failure to Inspect and Analyze the Physical Evidence

The Petitioner states in his brief:

- Trial counsel failed to inspect and analyze the state's physical evidence, which impaired the development of valuable information.

  Post-Conviction Court: Counsel was not ineffective in failing to request that clothing and other items be submitted to fingerprint and DNA analysis. Counsel's strategy to point out the lack of physical evidence connecting Petitioner Bane to the offense will not be faulted. Petitioner Bane has not demonstrated prejudice.

From what we glean from the record, the Petitioner argued below that trial counsel was ineffective in failing to submit the State's physical evidence, including a plunger found in the victim's bathroom, items recovered from the Petitioner's vehicle, and cigarette butts and beer cans found at the scene, for fingerprint and DNA analysis.

Judicial scrutiny of trial counsel's performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. We defer to counsel's trial strategy and tactical choices if they are informed ones based upon adequate preparation. *Hellard*, 629 S.W.2d at 9. The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

During trial, crime scene officers testified that they were unable to recover fingerprints from several items seized from the scene of the victim's death. The Petitioner's trial counsel testified that his trial strategy was to show that, because the State presented no fingerprint or DNA evidence placing the Petitioner at the crime scene, the State failed to meet its burden of proving that the Petitioner had committed this murder. Consistent with this strategy, counsel cross-examined the officers at trial about the lack of fingerprints and fibers tying the Petitioner to the scene and also about the officers' failure to request that any items be tested for DNA. Trial counsel testified that he did not seek the independent testing of any items because he believed it was more important to emphasize the lack of physical evidence. At the post-conviction hearing, the Petitioner offered no evidence to establish what independent fingerprint and/or DNA testing would have revealed.

We conclude first that the post-conviction court did not err when it found that the Petitioner's trial counsel's performance was not deficient in this regard. Trial counsel had an informed strategy that was reasonably supported, that the State lacked evidence against the Petitioner, which would have been greatly hampered had fingerprint and DNA testing revealed that the Petitioner had, in fact, been present at the crime scene. Further, even were we to conclude otherwise, the Petitioner has not proven by clear and convincing evidence that he was prejudiced. He offered no evidence showing what, if anything, further fingerprint or DNA testing would have revealed. *See Black*, 794 S.W.2d at 757-58. Thus, the Petitioner is not entitled to relief on this issue.

### v. Failure to Investigate and Present Evidence of an Alibi Defense

The Petitioner's brief states:

• Trial counsel failed to investigate and uncover alibi evidence.

    Post-Conviction Court: It appears that trial counsel did investigate a potential alibi defense and found that the defense

could not be supported. Petitioner Bane also has failed to present proof relating to potential alibi witnesses.

The Petitioner failed to present proof about any potential alibi witness at the post-conviction proceeding. To satisfy the prejudice requirement of *Strickland* when alleging that counsel was ineffective for failing to offer testimony from a favorable witness, the post-conviction petitioner must "(1) produce the witness at his post-conviction hearing; (2) show that through reasonable investigation, trial counsel could have located the witness; and (3) elicit both favorable and material testimony from the witness." *Denton v. State*, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing *Black*, 794 S.W.2d at 757). The Petitioner has not proven by clear and convincing evidence that he was prejudiced by his trial counsel's alleged failure to investigate an alibi witness. The Petitioner is not entitled to relief on this issue.

### vi. Failure to Obtain the State's Witness List

The Petitioner's brief states

•      Trial counsel failed to request and receive the state's witness list prior to trial, which would have facilitated defense investigation.

      <u>Post-Conviction Court</u>: Trial counsel testified that the state had open file discovery, that he received a witness list from the state, and that he interviewed several witnesses.

It is unclear to this Court what the Petitioner contends on appeal. There is no evidence to dispute trial counsel's testimony that he received a copy of the witness list from the State, which he used to locate and interview several witnesses. The Petitioner has not proven by clear and convincing evidence that trial counsel was not in possession of the list. He has also not proven how he was prejudiced by any actions of trial counsel in this regard.

### vii. Failure to Present Testimony from a Pathologist

The Petitioner's brief next states:

•      Trial counsel failed to present direct evidence of the cause of death through a pathologist available to prove drowning was not the cause of death.

-33-

> Post-Conviction Court: [Trial Counsel] testified with regard to
> the 1990 trial that he found no reason to dispute the cause of
> death based on their defense. Even if counsel's performance
> was deficient, Petitioner Bane has failed to show prejudice in
> terms of culpability. Regarding prejudice to the penalty phase
> and the HAC aggravating circumstances, the jury still would
> have heard the other circumstances surrounding the death. As
> for resentencing, counsel was not deficient in failing to call Dr.
> Sperry to testify. Counsel determined it was unnecessary to do
> so, and no evidence suggests Dr. Sperry's testimony would have
> differed from that of Dr. Francisco.[1]

As previously noted, trial counsel's strategy was to argue that, due to the State's lack of physical evidence and Brian Lovett's lack of credibility, his client was innocent. Trial counsel determined that challenging the victim's cause of death was not necessary in order to pursue this strategy. We agree. The Petitioner, who maintained his innocence, would not have reason to challenge the cause of the victim's death, which he argues was asphyxiation rather than drowning. That evidence may have only been relevant to challenge Brian Lovett's trial testimony. Lovett testified at trial, however, that he had not seen the murder. He said the Petitioner told him that "he put a cord around [Frazier's] neck and that my mother had put a plastic bag over [Frazier's] head, and that they had put him in a bathtub full of water." Brian Lovett did not state whether the victim had been strangled or drowned. This evidence, therefore, would also not have been helpful in cross-examining Lovett. We conclude that the Petitioner's trial counsel was not ineffective for failing to challenge the victim's cause of death.

Further, the Petitioner has also not proven how he was prejudiced by any alleged failure in this regard. We note first that, at trial, the State medical examiner, Dr. Harruff, did not testify that drowning was the cause of the victim's death but rather that a ligature strangulation with asphyxia was the cause of death. When the trial court asked Dr. Harruff if the victim had water in his lungs, Dr. Harruff responded that he found edema fluid in the victim's lungs but that it did not mean that the victim inhaled water from the bathtub. According to Dr. Harruff, "the finding of edema fluid in his lungs, or the water in his lungs, could have come from his own body fluids and not necessarily inhaled."

---

[1]While we note that the Petitioner's quotation from the post-conviction court's finding includes a finding about the Petitioner's counsel's representation at his resentencing hearing, we refrain from addressing that issue. The Petitioner states the issue only in terms of "[trial counsel['s]" failure. It appears, therefore, that his trial counsel's performance is the only issue he is maintaining on appeal.

Before resentencing, the Petitioner's resentencing counsel hired an independent pathologist, Dr. Sperry, to determine the victim's cause of death. During the resentencing hearing, the medical examiner testified that there was no water in the victim's lungs but that the victim had a small amount of phlegm or liquid in his bronchial tubes, which could have established drowning. Resentencing counsel did not present Dr. Sperry's testimony in part because he did not believe that Dr. Sperry's testimony would be effective given the medical examiner's adamant testimony that the victim drowned. Because no definitive proof about whether the victim died from asphyxiation or drowning has been presented, either cause of death remains plausible.

Ultimately, however, the jury's verdict of guilt was not contingent upon a determination that the victim, who was found dead in a water-filled bathtub, died from drowning as opposed to asphyxiation. The Petitioner maintained that he had not murdered the victim and was not present during the murder. Any evidence, therefore, about the cause of death would not have necessarily swayed the jury to believe that the Petitioner was, or was not, present. The Petitioner is not entitled to relief on this issue.

### viii. Jury Instructions

The Petitioner offers several issues regarding the deficiencies in his trial counsels' performance with regard to the jury instructions given at his trial sentencing. He briefs many of those issues more in depth later in the argument section of his brief, and we will, therefore, address them below.

### b. Assistance of Counsel at Resentencing

The Petitioner presents two issues with regard to the assistance of counsel at resentencing. He asserts they were ineffective for failing to object and request a mistrial when a witness during resentencing testified that the Petitioner had previously been sentenced to death and that they were ineffective for failing to object to the jury instructions.

### i. Testimony that Petitioner Bane had Previously Been Sentenced to Death

The Petitioner's brief states:

- Trial counsel at resentencing failed to object and request a mistrial when the state elicited testimony that Petitioner Bane had previously been sentenced to death.

-35-

> Post-Conviction Court: Petitioner Bane's prior sentence was not revealed until cross-examination of Brian Lovett at resentencing based on certain letters written by Donna Lovett. Counsel's strategy will not be second-guessed, and the letters could have cast doubt on the 1990 guilty verdict. Even if counsel was ineffective, there is not a reasonable probability that Petitioner Bane would not have received the death penalty.

Our review of the post conviction court's findings indicates that, during resentencing, the State introduced testimony from Brian Lovett. During the Petitioner's cross-examination of Lovett, his resentencing counsel introduced letters written by Donna Lovett to Brian Lovett and to the Petitioner in which she implicated Brian Lovett in the murder and indicated that the Petitioner was not the actual killer. As the post-conviction court indicated:

> The letter introduced implied that Brian Lovett was the person who murdered the victim and seemed to indicate that Donna Lovett was "surprised" by Brian Lovett's statements to police and prior trial testimony. In the letters Donna Lovett claims she lied to police and seems to indicate Brian Lovett was likewise untruthful. In one letter to [the Petitioner,] Lovett states, "by telling those lies about sitting around the trailer and planning a murder, he, [Brian Lovett], closed up the case on both of us." She goes on to state, "I told him and Tommy to tell the truth. . . . Well, he didn't, and you and I are the only ones that knows it." Later Lovett writes, "Now, I truly never thought you'd get the death penalty because you and I were the only ones who really knew what . . . went on . . . in that house."

The post-conviction court recognized that it may have been better for his resentencing counsel to request that the letters be introduced in some redacted form, but it said it would not second-guess counsel's strategy. The court found the letters clearly exonerated the Petitioner and implicated Donna Lovett's own son. The court further found that, even if counsel were ineffective for failing to request that the letters be redacted, the Petitioner had not proven prejudice.

We conclude that the evidence does not preponderate against the post-conviction court's findings. The jury in this case was aware that there had been a previous proceeding. They were instructed, however, to consider only the proof presented during the resentencing hearing. The United States Supreme Court has held that introduction of prior evidence of a death sentence was not constitutional error when the evidence did not "affirmatively [mislead] the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." *Romano v. Oklahoma*, 512 U.S. 1, 10 (1994). The Tennessee Supreme

Court has previously stated that "it is clearly improper, as a general rule, to inform a jury at a resentencing hearing that at a prior trial Defendant was sentenced to death." *State v. Miller*, 771 S.W.2d 401, 404 (Tenn. 1989). However, this "general" bar against the sentencing jury hearing evidence of a prior sentence of death is subject to qualification. *State v. Rimmer*, 250 S.W.3d 12, 32 (Tenn. 2008). "Generally, proof that a defendant in a resentencing hearing has previously been sentenced to die is improper; whether it is reversible error depends on the specific manner in which the evidence was presented." *Id*.

Considering the aforementioned authorities, we conclude that the Petitioner's resentencing counsel were not ineffective for failing to have the reference to the Petitioner's prior death sentence redacted from the letters. Counsel's aim was to show that Brian Lovett was lying when he implicated the Petitioner, and the letters Donna Lovett wrote to Brian Lovett and the Petitioner so indicated. While, in hindsight, it may have been better to redact the references to the Petitioner's prior sentence of death, we do not find that counsels' actions fell below an objective standard of reasonableness. In any event, we conclude the Petitioner has not proven prejudice. As the United States Supreme Court has noted, "it is virtually impossible to shield jurors from every . . . influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The jury was instructed to consider only the evidence presented at the resentencing hearing, and they are presumed to have followed that instruction. *State v. Ivy*, 188 S.W.3d 132, 144 (Tenn. 2006) ("Since the jury is presumed to follow jury instructions absent evidence to the contrary, we conclude that these instructions protected against the possibility of prejudice."). The evidence supporting the aggravating circumstances was overwhelming. The Petitioner is, therefore, not entitled to relief on this issue.

### ii. Jury Instructions

The Petitioner raises several issues regarding the deficiencies in his counsels' performance with regard to the jury instructions given at his resentencing hearing. He briefs many of those issues more in depth later in the argument section of his brief, and we will, therefore, address them below.

### 2. Constitutionality of the Petitioner's Sentence

The Petitioner's brief states that his sentencing was unconstitutionally based upon aggravating factors that were not presented to a grand jury and included in the indictment. We will also address that issue more in depth below.

## B. Grounds for Post-Conviction Relief Alleged on Appeal

In the argument section of the Petitioner's brief, he alleges five grounds for relief: (1) the post-conviction court erred when it gave deference to trial counsel's trial strategy and tactical choices because trial counsel admittedly did not review the file before testifying at the post-conviction hearing; (2) the Petitioner's trial was fundamentally unfair; (3) trial counsel's failure to challenge the warrantless seizure and search of Petitioner Bane's vehicle constitutes ineffective assistance of counsel; (4) the failure by trial counsel and resentencing counsel to ensure that the juries were fully and correctly instructed constituted ineffective assistance of counsel; and (5) the Tennessee death penalty scheme is unconstitutional.

## 1. Trial Counsel's Lack of Preparation for Post-Conviction Testimony

The Petitioner contends that, because trial counsel did not adequately prepare for his testimony at the Petitioner's post-conviction hearing, the post-conviction court erred when it gave deference to trial counsel's strategic decisions. He asserts that this, in combination with the accidental destruction of counsel's file on the Petitioner's trial and the fact that the post-conviction judge had not presided over the Petitioner's trial, thwarted his efforts to prove the facts that demonstrated counsel's performance was ineffective. The Petitioner points to the following exchange between the post-conviction court and trial counsel:

THE COURT: And, [trial counsel], how can you come to my courtroom on a post-conviction case and you don't remember anything about the case?

[Trial counsel]: Well --

THE COURT: I mean, did you do any preparation for your testimony today?

[Trial counsel]: Well, I really didn't, Your Honor other than the record. I didn't have a chance to read the record.

THE COURT: Did you even read the report of the appellate opinion in the case? Basically, you came here to testify with the intent of just saying "I don't remember anything," without making any effort to get ready for this testimony. Is that correct?

[Trial counsel]: Well, that is correct. I usually would depend on [the Assistant District Attorney General]. He would usually go over it with me.

THE COURT: Well, you understand that we're going to have an academic exercise in futility today because of your lack of preparation?

[Trial counsel]: Well, I apologize, Your Honor. You know, usually I meet with [the Assistant District Attorney General]. But –

[Assistant District Attorney General]: He doesn't have a file. It's a situation where I don't know what he did because his file is burned up. I've got – all I've got is the actual, you know, other than reviewing the transcript, I've got the court opinions. But I can't – I don't know what his file had in it.

THE COURT: All right. I'm going to give [the Petitioner's post-conviction counsel] a little more leeway than we normally would, otherwise we're just wasting our time.

In support of his assertion that trial counsel's inability to recall what occurred before and during his trial, the Petitioner cites to the American Bar Association Guidelines that govern attorneys representing defendants facing the penalty of death. *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.13.

The State responds first that the Petitioner fails to identify precisely where the post-conviction court applied this standard, why the standard was incorrectly used, and how it affected the outcome of the post-conviction court's analysis. Further, the State asserts that the post-conviction court offered this deference to trial counsel's strategic decisions in only two instances: (1) trial counsel's failure to cross-examine Brian Lovett regarding his mental health record; and (2) failure to test certain items of evidence for additional fingerprints or DNA evidence. The State asserts that neither of these findings by the post-conviction court was erroneous.

We understand the Petitioner's and the post-conviction court's frustration with trial counsel's failure to review the record and refresh his memory before testifying at the post-conviction hearing. We further understand that it is harder for a court to determine whether an attorney representing a defendant had a viable trial strategy, which should not be second-guessed in hindsight, if the attorney cannot remember his own strategy at the time of the post-conviction hearing.

That being said, we do not find that relief is required under the set of facts presently before us. The post-conviction court herein only deferred to trial counsel's strategy on two issues, and we conclude that it erred in neither of those instances. As we previously stated, while trial counsel did not recall why he did not use Brian Lovett's mental health history

-39-

during his cross-examination of Lovett, General Henderson offered a reasonable and understandable explanation about why the Petitioner's trial counsel would not have wanted to cross-examine Brian Lovett about his mental health history. The general explained that Brian Lovett was a sympathetic witness. His mental health problems were derived from his sister's suicide, his father's neglect, and his mother's new relationship with the Petitioner, whom she helped escape from prison. Were the Petitioner's trial counsel to cross-examine Brian Lovett about his mental history, much of that evidence, a great deal of which the jury did not hear, would have been admissible. Trial counsel focused his cross-examination of Lovett on Lovett's inconsistent statements and his admission of dishonesty.

The second strategic decision of counsel to which the post-conviction court deferred was trial counsel's failure to request that evidence found by police be tested for fingerprints and DNA. By all accounts, the Petitioner maintained that he was not at the scene of the murder when the victim was killed and that he did not participate in the planning or execution of the murder. The evidence that was tested by the State came back negative for the Petitioner's DNA and fingerprints. Based upon this and the Petitioner's proclamations of innocence, trial counsel did not request testing of the other evidence. His trial strategy was to assert the Petitioner was innocent and that the State could not prove beyond a reasonable doubt otherwise. As we stated above, we think this was a reasonable strategy under the circumstances. We further conclude that the post-conviction court did not err when it offered deference to trial counsel's strategy in this regard. The Petitioner is not entitled to relief on this issue.

### 2. Fundamental Fairness

The Petitioner asserts that, while the post-conviction court examined each of the Petitioner's claims of ineffective assistance of counsel individually, it failed to look at the effect trial counsel's performance had on the fundamental fairness of his trial. He asserts that while each individual instance in which counsel's performance was deficient may not have, in itself, prejudiced him, the cumulative effect of those deficiencies rendered his trial fundamentally unfair. The Petitioner notes that trial counsel spent only sixty-eight hours on his case total, which, he asserts, was not sufficient. The Petitioner cites to a recent opinion by this Court, in which we stated that "[w]hen an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." *Timothy Terell McKinney v. State*, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at *37 (Tenn. Crim. App., at Jackson, Mar. 9, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010).

The State counters that the Petitioner has waived our review of any claim of "cumulative deficiencies" because he failed to raise the issue in his petition for post-

conviction relief or at his post-conviction hearing. *See* T.C.A. § 40-30-106(a) (holding that a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented"). The Petitioner submitted a reply brief in which he maintained his claim is not one of "cumulative deficiencies" but that he is requesting that this Court examine the holding in *Strickland* that "the ultimate focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged," such that "[i]n every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.

In *McKinney*, the case to which the Petitioner cites in support of this contention, this Court discussed the cumulative effect of a trial counsel's errors where one of counsel's errors was a failure to investigate the case. The facts in *McKinney* proved that counsel knew of or should have known of contradicting identifications by witnesses, including two of the prosecution's key witnesses. In *McKinney*, the petitioner's post conviction counsel provided numerous exhibits illustrating that the investigators informed trial counsel of numerous conflicting statements of witnesses. The testimony at McKinney's original trial evidences that trial counsel essentially ignored the conflicting statements by failing to cross-examine the two key witnesses thoroughly and by failing to present the testimony of additional witnesses who were present at the time of the shooting. Trial counsel had within their control admissible evidence which would have permitted the defense to emphasize flaws in the prosecution's case. By failing to cross-examine the witness effectively about his conflicting statements regarding the identification he provided of the shooter, trial counsel left the jury with essentially unrequited and untested testimony. Trial counsel's failure to use the witness's prior statements as well as his failure to use the conflicting identifications of other witnesses failed to subject the prosecution's case adequately to the adversarial process. Based upon these facts, and the fact that the evidence against McKinney was not overwhelming, we stated:

> When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice. *See Harris by and through Rhymster v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (citations omitted). While it remains the burden of the Petitioner to "prove prejudice," *see Strickland*, 466 U.S. at 693, the Petitioner is not required to demonstrate how the result would have been different. Rather, a defendant must show that there is a reasonable

probability that absent the deficiencies of counsel the outcome of the trial would have been different. A reasonable probability does not mean a certainty, or even a more likely than not different outcome. *Strickland*, 466 U.S. at 694. It does not mean that no rational juror could constitutionally find the Petitioner guilty. The reviewing court does not ask as to whether the defendant is innocent of the crime. The question remains whether the defendant was deprived of a reasonable chance of acquittal due to his counsel's performance.

The inconsistent testimony and statements of [the two key witnesses] could easily have raised questions in the minds of the jurors regarding their credibility and their ability to identify the Petitioner as the shooter. Questions of credibility of witnesses are not aptly reviewed in hindsight by an appellate court. Conflicting statements may appear insignificant upon a cold record after the fact. The same statements, however, may very well prove significant when observed first hand by a jury. As such, it is the jury, not the appellate court, whose province it is to evaluate the witnesses credibility and to decide the defendant's guilt. *See Matthews v. Abramajtys*, 319 F.3d 780, 790 (6th Cir. 2003). The actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is the task to be performed by a rational jury. Counsel in the present case failed to present such a case to the jury with their failure to cross-examine competently the witnesses identifying the Petitioner as the shooter. The jury in the present case was deprived of the right to hear testimony that could have supplied a "reasonable doubt." Counsel's failure to present readily available evidence challenging the eyewitness identification sufficiently undermines confidence in the outcome of this case to establish prejudice. *See, e.g., Avery v. Prelensnik*, 548 F.3d 434, 439 (6th Cir. 2008) (counsel's failure to investigate testimony of potential alibi witnesses prejudiced defendant's trial); *Higgins v. Renico*, 470 F.3d 624, 635 (6th Cir. 2006) (counsel's failure to cross-examine key identification witness undermined confidence in outcome of case). Counsel's failure to conduct an adequate pretrial investigation, counsel's failure to prepare for trial adequately, and counsel's failure to use the information available at the time of trial suffices for a showing of prejudice. Counsel's deficient actions throughout their representation of the Petitioner collectively establish a prejudice of such magnitude that we can reach no conclusion other than that the errors cumulatively prejudiced the Petitioner's right to a fair proceeding and undermined confidence in the outcome of the trial. We conclude that a reasonable probability exists that absent the deficiencies of counsel, the outcome of the trial would have been different.

2010 WL 796939, at *37.

After a thorough examination of *McKinney*, we find that its facts are distinguishable from the facts presented by the case presently before us. As we have previously stated, trial counsel should have hired an investigator to investigate the case more thoroughly. There is no evidence, however, that such investigation would have led to information that benefitted the Petitioner. As previously stated, the Petitioner proclaimed his innocence. Trial counsel relied upon this proclamation in creating and executing his trial strategy. Further, trial counsel chose not to cross-examine Brian Lovett on his mental health history for fear it would evoke sympathy toward him from the jury. Unlike the trial counsel in *McKinney*, trial counsels' performance in this case was in most instances not deficient and trial counsel presented a viable theory of defense based upon their client's assertions of innocence. We do not think that any deficient actions by trial counsel collectively establish a prejudice of such magnitude that the errors cumulatively prejudiced the Petitioner's right to a fair proceeding and undermined confidence in the outcome of the trial. In fact, after our thorough review of the evidence presented at the Petitioner's trial, we are convinced that his trial was, in fact, fair. He is not entitled to relief on this issue.

### 3. Motion to Suppress

The Petitioner contends that trial counsel was ineffective in failing to file a motion to suppress the evidence seized during the warrantless seizure and search of the Petitioner's vehicle. He asserts that, had his trial counsel filed such a motion, the motion would have been granted and the evidence against him suppressed. The Petitioner concedes that his trial counsel filed a motion to suppress the evidence seized from his vehicle based upon the fact that the Petitioner did not consent to the search of his vehicle. The trial court denied this motion finding that the Petitioner voluntarily consented to the search. The Petitioner contends, however, that trial counsel also should have challenged the "initial warrantless entry onto the private premises to 'seize' Petitioner Bane's vehicle and the subsequent search of the vehicle." He asserts that the legality of the warrantless "seizure" of the vehicle from private property has not been previously determined. The State counters that the post-conviction court correctly determined that the Petitioner did not prove by clear and convincing evidence that he was prejudiced by counsel's failure because the evidence proved that Donna Lovett consented to the initial seizure of the Petitioner's vehicle and that her consent waived the Petitioner's protection against an unreasonable search and seizure of his vehicle.

The post-conviction court dedicated twenty-three pages of its order denying the Petitioner post-conviction relief to an in-depth and thorough analysis of this issue. The post-conviction court ultimately found that trial counsel was deficient in failing to present the

suppression arguments raised by the Petitioner but that the Petitioner had not proven prejudice.

We will not disturb the post-conviction court's finding that trial counsel was ineffective for failing to file a motion to suppress based upon the legality of the initial seizure of the Petitioner's vehicle. We will turn, therefore, to address whether the post-conviction court correctly concluded that the Petitioner did not prove that trial counsel's failure prejudiced him. On appeal, the Petitioner does not claim that the officers lacked probable cause to search the automobile but instead contends that there were no exigent circumstances justifying the search because his vehicle was found parked in the driveway of his private residence after the Petitioner was placed in custody. Further, because he interprets the law at the time of his trial to have required exigent circumstances to justify a warrantless search of his vehicle, he asserts that a motion to suppress based on these grounds would have been granted. Thus, he contends, trial counsel's failure to file such a motion prejudiced him and entitles him to post-conviction relief.

Both the federal and state constitutions protect against unreasonable searches and seizures. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, section 7 of the Tennessee Constitution also guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures." A search or a seizure without a warrant is presumptively unreasonable. *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Fuqua v. Armour*, 543 S.W.2d 64, 66 (Tenn. 1976).

The "automobile exception" to the warrant requirement permits an officer to search an automobile if the officer has probable cause to believe that the automobile contains contraband. *Carroll v. United States*, 267 U.S. 132, 149 (1925). The rationale for the automobile exception is twofold. *California v. Carney*, 471 U.S. 386, 392-93 (1985). First, due to the inherent mobility of automobiles, it is often impractical for officers to obtain search warrants. *Id*. at 393. Second, individuals have a reduced expectation of privacy in their automobiles. *Id*. An officer who has probable cause to believe that the automobile contains contraband *may either seize the automobile and then obtain a warrant* or immediately search the automobile. *Chambers v. Maroney*, 399 U.S. 42, 52 (1970) (emphasis added). "Given probable cause to search, either course is reasonable under the Fourth Amendment." *Id*.

Since the time of the Petitioner's trial, the United States Supreme Court and the Tennessee Supreme Court have clarified that neither the United States nor Tennessee constitutions requires a separate finding of an exigency in addition to a finding of probable

-44-

cause in order for the automobile exception to apply. *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *State v. Saine*, 297 S.W.3d 199, 207 (Tenn. 2009). Earlier cases, however, indicated that the application of the automobile exception had two requirements: probable cause and exigent circumstances. *See, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 463 (1971); *Fuqua*, 543 S.W.2d at 67. In *Fuqua v. Armour*, one case cited by the Petitioner, the Tennessee Supreme Court likened the exigent circumstances necessary to support a warrantless search of a vehicle as similar to a vehicle moving "on the public highway which makes it impracticable to obtain a search warrant and does not apply to authorize a search or seizure of a vehicle without a warrant after the vehicle has completed its journey and is at rest on private premises." *Fuqua*, 543 S.W.2d at 66.

In *State v. Byerley*, 635 S.W.2d 511, 515 (Tenn. 1982), the Court revisited its holding in *Fuqua*. The Court observed that "[t]o claim that *Fuqua* stands for the proposition that exigent circumstances can never occur in relation to a car parked on private property is erroneous," noting that the vehicle in question in *Fuqua* "had been parked in the same place in a driveway for three weeks, and at a time when the defendant was in custody." *Byerley*, 635 S.W.2d at 515. The Court further held that "the fact that a car is parked on private grounds . . . does not automatically foreclose the occurrence of some exigency permitting a warrantless search." *Id.* at 515.[2]

Approximately three years after *Byerley*, and before the Petitioner's 1990 trial, the United States Supreme Court in *California v. Carney*, 471 U.S. 386, 391 (1985), held that "even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicle exception." The Court further held that "the pervasive schemes of regulation [of vehicles], which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met." *Carney*, 471 U.S. at 391. The Court found that the agents had sufficient probable cause to search the vehicle. *Id*. However, in upholding the search, the Court did not mention any of the factors bearing upon exigency such as whether the owner of the vehicle was in custody or whether another person might have removed the vehicle or the contraband. *See State v. Leveye*, 796 S.W.2d 948, 952 (Tenn. 1990) (a case discussing *Carney* that was issued September 24, 1990, which was after the Petitioner's trial). Justice Stevens dissented and interpreted the majority opinion as follows: "In the absence of any evidence of exigency in the circumstances of this case, the

_____

[2]In a case decided after the Petitioner's trial, this Court examined the *Byerley* holding and determined the fact that a vehicle is parked on private property does not preclude a finding of exigency. *See also State v. Jason Paul Sherwood*, No. M2005-01883-CCA-R3-CD, 2007 WL 189376, *10 (Tenn. Crim. App., at Nashville, Jan. 26, 2007), *no Tenn. R. App. P. 11 application filed.*

Court relies on the inherent mobility of the motor home to create a conclusive presumption of exigency." *Carney*, 471 U.S. at 404 (J. Stevens dissenting). At the time of the Petitioner's trial, some federal circuit courts had concurred with the dissent's interpretation of the majority opinion. *See e.g., United States v. Vasquez*, 858 F.2d 1387, 1391 (9th Cir. 1988); *United States v. Paulino*, 850 F.2d 93, 94-95 (2nd Cir. 1988); *United States v. Rivera*, 825 F.2d 152, 158 (7th Cir. 1987).

Thus, at the time of the Petitioner's trial, there was a question as to whether a separate finding of exigency was a requirement for application of the vehicle exception to the warrant requirement in light of the holding in *Carney*. Regardless, Tennessee law was clear that even if exigency was a separate requirement, the existence of exigent circumstances did not depend upon whether the vehicle was seized while on public property or while parked on private property. Rather, the existence of exigency was to be determined on a case by case basis.

In the present case the police seized the vehicle while it was on private property. They entered the property with the consent of Donna Lovett. For the first time in this appeal, the Petitioner contends that the State did not prove that Donna Lovett offered her consent. He has waived that issue by his failure to make this objection during his original trial or his first appeal and by his failure to raise this issue to the post-conviction court during the post-conviction proceedings. *See* Tenn. R. App. P. 10(b).

Having found that the police were lawfully present at the location of the vehicle, we turn to address whether they properly seized the Petitioner's vehicle. The parties agree that the police had probable cause to search the vehicle. If the motion to suppress the initial seizure of the vehicle had been filed, it is possible, considering that the law at the time was unclear whether exigent circumstances were necessary to support such a seizure, that the trial court would have denied the motion based upon the police having probable cause alone. That being said, we will still examine whether there were also exigent circumstances that supported the law enforcement officer's seizure of the Petitioner's vehicle.

We conclude that there were, in fact, exigent circumstances to justify the seizure and search of the vehicle by the Lauderdale County Sheriff's Department. Donna Lovett informed officers that items stolen from the victim's residence and at least one weapon were in the trunk of the Petitioner's vehicle. Information regarding the homicide was partially corroborated by the Memphis authorities. Law enforcement had legitimate concerns about the potential for destruction of the evidence in the vehicle. The vehicle was parked next to the trailer where the Petitioner lived with Donna Lovett and her two teenage sons. Brian Lovett was not in custody, and the full extent of his participation in the offense was not then known. Brian and Thomas Lovett were living at the trailer where the vehicle was parked,

and Brian had been known to drive the vehicle. If the vehicle was left unsecured, Brian and Thomas Lovett may have been motivated to dispose of the evidence in an effort to assist either the Petitioner or their mother. Moreover, a danger existed that either Brian or Thomas Lovett, both of whom had access to the vehicle, could inadvertently destroy or contaminate the evidence. Thus, even if trial counsel had sought suppression of the items recovered from the vehicle arguing lack of exigent circumstances supporting the initial seizure of the vehicle, we conclude that the trial court would not have granted the motion.

We further conclude that, had the Petitioner's counsel appealed the denial of this motion, it would have been upheld on appeal. A few months after the Petitioner's trial, the Tennessee Supreme Court released its opinion in *Leveye*, 796 S.W.2d at 948, in which the Court adopted the interpretation set forth in *Carney* and held that the inherent mobility of vehicles creates a conclusive presumption of exigency provided the officers have probable cause to believe that the vehicle contains contraband. *Leveye*, 796 S.W.2d at 952-53 (citing *Carney*, 471 U.S. at 392-93). The *Leveye* Court observed that "[d]istinctions may be made by the [United States Supreme] Court in future cases between vehicles parked in public places and elsewhere, or return to some particularized restriction on mobility." *Leveye*, 796 S.W.2d at 952. Neither *Carney* nor *Leveye*, however, made such a distinction. Therefore, even if appellate review was sought regarding the suppression motion, the search and seizure of the Petitioner's vehicle would have been upheld given the holding in *Leveye*.

In order to succeed in establishing ineffective assistance of counsel in trial counsel's failure to file a motion to suppress, the Petitioner must satisfy both prongs of the *Strickland* test, showing that trial counsel's failure to file the motion to suppress was deficient and that the deficient performance prejudiced the defense. *See Vaughn v. State*, 202 S.W.3d 106, 120-21 (Tenn. 2006). The Petitioner has failed to establish that, even if trial counsel had sought suppression of the items found in the trunk of the vehicle based upon the initial search and seizure of the vehicle by the Lauderdale County Sheriff's Department, the motion would have been granted. Accordingly, the Petitioner is not entitled to relief with regard to this issue.

### 4. Jury Instructions

The Petitioner takes issue with the instructions offered to the jury in several instances, for some of which he faults trial counsel, for some of which he faults resentencing counsel, and for some of which he faults the trial court. The Petitioner takes issue with the jury instructions from his 1990 trial and his 1997 resentencing hearing.

### a. 1990 Trial
### i. Burden of Proof Instruction

The Petitioner contends that at his 1990 trial the trial court failed to correctly instruct the jury about the burden of proof, and his trial counsel failed to object to the trial court's instruction on the burden of proof. The State asserts that the Petitioner waived this issue by failing to offer more than a cursory argument to support his assertion. The post-conviction court found that the burden of proof instruction given in the 1990 trial complied with constitutional mandates and denied the Petitioner relief.

In his brief, the Petitioner contends that the appropriate charge for his jury would have been:

> [T]he [S]tate has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the [S]tate throughout the trial of the case. The defendant is not required to prove his innocence.

T.P.I. Crim. 2.02.

The evidence included in the record proves that the trial court instructed the jury as follows after it was empaneled:

> In this case, ladies and gentlemen, you enter upon this investigation with the presumption that the defendant is not guilty of any crime, and this presumption stands as a witness for him until it is rebutted and overturned by competent and credible proof. It is therefore incumbent upon the State before you can convict the defendant to establish to your satisfaction beyond a reasonable doubt that the crime charged in the indictment has been committed, the same was committed within the County of Shelby, the State of Tennessee, before the finding of the indictment, and that the defendant at bar committed the crime in such a manner that would make him guilty under the law heretofore defined and explained to you, which the Court will later do.
>
> Reasonable doubt is that doubt that is engendered by an investigation of all of the proof in the case and an inability after such investigation to let the mind rest easily upon the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from mere possibility because absolute certainty of guilt is not demanded by the law to convict of any criminal charge but moral

certainty is required, and this certainty is required as to every proposition of proof that is requisite to constitute the offense.

The trial court gave the jury this same instruction as part of its jury charge after the parties offered closing arguments.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 51 U.S. 1, 5 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . [t]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id*. (citations omitted). In the case under submission, we conclude that the trial court "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction." *See Pettyjohn v. State*, 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994). Accordingly, trial counsel was not ineffective in failing to request the pattern jury instruction, in failing to object to the trial court's instruction, or in failing to raise the issue on direct appeal.

Further, the Petitioner is not entitled to relief based upon the instruction offered to the jury by the trial court because he did not present it for review in his direct appeal. "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). This issue could have been presented on direct appeal. Thus, the Petitioner is not entitled to post-conviction relief on this issue.

### ii. 1990 Jury Verdict Form

The Petitioner contends trial counsel was ineffective during the penalty phase of the 1990 trial for failing to object to the trial court's instruction as to the proper verdict form for death and for failing to appeal the issue. He also contends that he is entitled to post-conviction relief based solely upon the trial court's allegedly improper instructions. The Tennessee Supreme Court, however, reversed the 1990 jury's imposition of the death penalty and remanded the case to the trial court for re-sentencing based upon other grounds. *See Bane*, 57 S.W.3d at 418. This issue, therefore, is not properly before us. The Petitioner also raises this same issue with regard to his 1997 resentencing, and we will address it below.

### b. 1997 Resentencing Hearing

After the Petitioner appealed his 1990 convictions and sentencing, the Tennessee Supreme Court remanded the case for the Petitioner to be resentenced. This resentencing occurred in 1997, and the Petitioner contends his resentencing counsel failed to: (1) object to the jury instructions relative to the appropriate verdict forms and lessening the state's burden and failed to raise this issue in the motion for new trial or on appeal; and (2) ensure that all mitigating circumstances were included in the jury instructions.

### i. 1997 Jury Verdict Form

The Petitioner argues that resentencing counsel was ineffective in failing to challenge the trial court's instruction as to the proper verdict form for a verdict of life in prison and in failing to raise the issue on direct appeal. The pertinent portion of the trial court's instruction reads as follows:

> There is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance.
>
> . . . .
>
> If you unanimously determine that no statutory aggravating circumstance has been proven by the State beyond a reasonable doubt, or if you unanimously determine that a statutory aggravating circumstance or circumstances have been proved by the State beyond a reasonable doubt but that said statutory aggravating circumstance or circumstances do not outweigh one or more mitigating circumstances, the sentence shall be life imprisonment.

The Petitioner avers that the instruction lessened the State's burden by requiring that the jury find that the State failed to prove the aggravating factors unanimously. The Petitioner, however, concedes that the trial court properly instructed the jury using the pattern charge that existed at the time of the commission of the offense. The Petitioner states, "Notwithstanding what the pattern instructions approved at the time [of the Petitioner's trial], Petitioner Bane does not waiver in his belief that it is unacceptably prejudicial to instruct as was done at the original trial and at the resentencing trial." We conclude that the jury was properly instructed. The Petitioner is not entitled to relief on this issue.

### ii. Instruction of Specific Mitigating Factors

Finally, the Petitioner claims that re-sentencing counsel was ineffective in failing to ensure that all non-statutory mitigating factors were instructed to the jury. The issue is waived due to the Petitioner's failure to offer any argument or citations to case law supporting his claim. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, the trial court was not required to charge the jury on specific, non-statutory mitigating circumstances at the time of this offense. *See State v. Cauthern*, 967 S.W.2d 726, 747 (Tenn. 1998). Thus, the Petitioner is not entitled to relief on this issue.

### 5. Constitutionality of the Death Penalty

Finally, the Petitioner raises numerous issues regarding the constitutionality of the death penalty. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, the Petitioner's claims are waived. *See* T.C.A. § 40-30-106(g). Regardless of waiver, the Petitioner is not entitled to relief.

The Petitioner alleges that the Tennessee death penalty sentencing statute and the imposition of the sentence of death in this state violate Amendments 5, 6, 8, and 14 of the United States Constitution, as well as Article I, sections 8, 9, 16, and 17; Article II, section 2; and Article XI, section 8 of the Tennessee Constitution. He complains that Tennessee's death scheme fails to meaningfully narrow the class of eligible defendants. This argument has previously been addressed and rejected. *See State v. Vann*, 976 S.W.2d 93, 117-18 (Tenn. 1998); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994).

The Petitioner alleges that the appellate review process in death penalty cases is constitutionally inadequate. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our Supreme Court on numerous occasions. *See State v. Cazes*, 875 S.W.2d 253, 270-71 (Tenn. 1994); *see also State v. Harris*, 839 S.W.2d 54, 77 (Tenn. 1992). The Tennessee Supreme Court has recently held that, "[w]hile important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997).

The Petitioner complains that unlimited discretion is vested in the prosecutor as to whether to seek the death penalty. This argument has been rejected. *See State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995). The Petitioner contends that the unlimited discretion of the

thirty-one elected District Attorneys General violates principles set out in *Bush v. Gore*, 531 U.S. 98 (2000). This Court has previously considered and rejected this claim. *See David Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258, at *69 (Tenn. Crim. App., at Jackson, June 5, 2006), *perm. app. denied* (Tenn. 2006).

The Petitioner argues that the death sentence is unconstitutional because it infringes upon his fundamental right to life. This complaint is contrary to settled precedent as reflected in *Cauthern v. State*, 145 S.W.3d 571, 629 (Tenn. 2004).

The Petitioner asserts that his sentence of death violates the Due Process Clause, Article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. He argues that his indictment was flawed because the aggravating circumstances that made him eligible for the death penalty were not submitted to the grand jury and not returned in the indictment. The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. *State v. Reid*, 164 S.W.3d 286, 312 (Tenn. 2005); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004).

Finally, the Petitioner complains that Tennessee's imposition of the death penalty violates United States treaties and the federal constitution's Supremacy Clause. The Petitioner contends that the Supremacy Clause is violated when his rights under treaties and customary international law to which the United States is bound are disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. *See State v. Odom*, 137 S.W.3d 572, 600 (Tenn. 2004); *Chalmers*, 2008 WL 2521224, at **45-46.

### III. Conclusion

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE